# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JEFFREY GOWER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) C.A. No. 2020-0996-PAF |
| | ) | |
| TRUX, INC., VIKING VENTURE | ) | |
| PARTNERS, LLC, MICHAEL | ) | |
| SACCONE, SR., MICHAEL | ) | |
| SACCONE, JR., MICHAEL | ) | |
| WHOULEY, and RICHARD | ) | |
| SACCONE, | ) | |
| | ) | |
| Defendants. | | |

## MEMORANDUM OPINION

Date Submitted: November 8, 2021
Date Decided: February 23, 2022

Brandon W. McCune, BLANK ROME LLP, Wilmington, Delaware; Patrick J. Hannon, HARTLEY MICHON ROBB HANNON, LLP, Boston, Massachusetts; *Attorneys for Plaintiff Jeffrey Gower*.

Richard M. Beck, Sean M. Brennecke, KLEHR HARRISON HARVEY BRANZBURG LLP, Wilmington, Delaware; Lawrence P. Murray, Gregory Paonessa, BURNS & LEVINSON LLP, Boston, Massachusetts; *Attorneys for Defendant Trux, Inc.*

Kevin J. Mangan, WOMBLE BOND DICKINSON (US) LLP, Wilmington, Delaware; Hayden J. Silver, III, WOMBLE BOND DICKINSON (US) LLP, Raleigh, North Carolina; *Attorneys for Defendant Viking Venture Partners, LLC*.

S. Michael Sirkin, R. Garrett Rice, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Scott C. Ford MINTZ, LEVIN, COHN, FERRIS, GLOVSKY & POPEO, P.C., Boston, Massachusetts; *Attorneys for Defendants Michael Saccone, Sr., Michael Saccone, Jr., and Michael Whouley*.

Samuel T. Hirzel, Elizabeth A. DeFelice, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Kevin T. Peters, Michael D. Brier, GESMER UPDEGROVE LLP, Boston, Massachusetts; *Attorneys for Defendant and Counterclaim Plaintiff Richard Saccone.*

**FIORAVANTI, Vice Chancellor**

This action concerns alleged breaches of an agreement among stockholders of Trux, Inc. ("Trux" or the "Company"). The agreement, defined below as the ROFR Agreement, prescribes a detailed process governing any proposed transfer of shares and provides rights of first refusal and co-sale rights. The plaintiff, Jeff Gower, alleges that three other Trux stockholders sold their shares to a fourth stockholder, Viking Venture Partners, LLC ("Viking"), in violation of the ROFR Agreement. His headline claim alleges the share sales were effected without providing Gower and other stockholders the requisite notice as required by the ROFR Agreement. Gower asserts claims for breach of contract and the implied covenant of good faith and fair dealing. Gower also seeks a declaratory judgment that the resulting breaches render the share transfers null and void under the express terms of the ROFR Agreement. All of the defendants, except one, have moved to dismiss the complaint in its entirety. This opinion denies the motions to dismiss the breach of contract and declaratory judgment claims, but grants the motions to dismiss the implied covenant claim.

# I.     BACKGROUND

Unless otherwise specified, the facts recited in this Memorandum Opinion are drawn from the Amended Verified Complaint and documents integral thereto.[1]

## A.     The Parties

Trux is a privately held Delaware corporation based in Waltham, Massachusetts.[2]  It is a technology company that "facilitates trucking services in the construction industry."[3]  The other parties are or were stockholders of Trux at the times relevant to the claims in this case.

Gower served as Trux's Chief Executive Officer ("CEO") from January 2018 until he was terminated in January 2020.[4]  According to the Company, Gower owned 809,994 shares at the time of the share transfers.[5]

Defendants Michael Saccone, Sr.,[6] Michael Saccone, Jr., and Michael Whouley owned approximately 19%, 7.5%, and 6.3%, respectively, of Trux's stock

---

[1] Exhibits attached to the Amended Verified Complaint ("Compl.") will be cited as "Ex."

[2] Compl. ¶ 9.

[3] *Id.* ¶ 16.

[4] *Id.* ¶¶ 17, 27.

[5] Ex. K.

[6] Michasel Saccone Sr. was also a member of Trux's board of directors (the "Board"). Compl. ¶ 11.

2

immediately prior to selling it to Viking.[7]  Defendant Richard Saccone,[8] who intervened as a defendant and has not moved to dismiss, owned approximately 30.3% of Trux's outstanding stock prior to selling his shares to Viking.[9]

Viking is a Delaware limited liability company and is based in Birmingham, Alabama.[10]  Viking is a wholly owned subsidiary of Vulcan Materials Company, LLC, one of Trux's largest customers.[11]  Viking owned approximately 22.2% of Trux's stock at the time of the events at issue.[12]

Michael Sr., Michael Jr., Richard, and Whouley are referred to as the "Selling Stockholders."  Michael Sr., Michael Jr., and Whouley are referred to as the "Moving Sellers" and, together with Viking, the "Moving Defendants."  The Moving Defendants, Trux, and Richard are referred to as the "Defendants."

## B.     The Right of First Refusal and Co-Sale Agreement

The claims in this case all arise from a contract to which all of the litigants here are parties.  That agreement is the Trux, Inc. Right of Refusal and Co-Sale

---

[7] Compl. ¶¶ 11–13.  The court calculates these figures to be 18.7%, 7.4%, and 6.2%.  *See* Ex. A, Scheds. A–B.

[8] For ease of reference, this Memorandum Opinion refers to Michael Saccone, Sr. as "Michael Sr.," Michael Saccone, Jr. as "Michael Jr.," and Richard Saccone as "Richard." No disrespect or familiarity is intended.

[9] *See* Ex. A (Scheds. A–B).

[10] Compl. ¶ 10.

[11] *Id.*

[12] *See* Ex. A (Scheds. A–B).

Agreement (the aforementioned "ROFR Agreement"), dated as of April 6, 2018.[13] The ROFR Agreement has two categories of signatories—"Investors"[14] and "Stockholders."[15] Viking and three non-parties to this case are identified as Investors.[16] Gower and the Selling Stockholders are identified as being among the Stockholders.[17] The ROFR Agreement also confers rights upon Gower, Viking, and the Selling Stockholders as "Closing Stockholders"—the "holders of Common Stock as of the closing of the transactions" on April 6, 2018, when a separate share purchase agreement between Trux, Viking, and the other Investors became effective.[18]

---

[13] Ex. A.

[14] *Id.* § 1.11 (defining "Investors" as "the persons named on Schedule A" and any assignees pursuant to the terms of the ROFR Agreement).

[15] *Id.* (Sched. B) (identifying the "Stockholders" as of April 6, 2018); *id.* § 1.23 (defining a "Stockholder" as "any holder of Capital Stock of the Company, each person to whom the rights of a Stockholder are assigned pursuant to Subsection 3.1, each person who hereafter becomes a signatory to this Agreement pursuant to Subsection 6.9 or 6.16 and any one of them, as the context may require").

[16] *Id.* (Sched. A).

[17] *Id.* (Sched. B).

[18] *See id.* § 1.4 (defining "Closing Stockholders" as "the holders of Common Stock as of the closing of the transactions described in the Purchase Agreements"); *id.* (Recitals B–C) (defining the "Purchase Agreement" and identifying its effective date as the "even date herewith"); *id.* (Scheds. A–B) (identifying Gower, Viking, and the Selling Stockholders as holding shares as of April 6, 2018).

# 1.    The Process for Transferring Shares of Trux Stock

The ROFR Agreement prescribes a process that a Stockholder must follow to sell or transfer its shares of Trux stock (the "Sales Process"). As summarized here and detailed below, in the event a Stockholder wishes to sell or transfer its shares to a third party, the Stockholder must provide 60 days' notice of the transaction and its material terms to the Company and all Closing Stockholders. Delivery of the notice triggers a waterfall of rights of refusal and corresponding notice obligations. Viking has the highest priority right of first refusal (the "Special ROFR"), subject to certain limitations. The Investors have the second-highest priority right of refusal ("the Right of First Refusal"), and the Closing Stockholders have the third-highest priority right of refusal (the "Secondary Refusal Right"). If there are shares remaining after each Stockholder has exercised (or failed to exercise) its respective right of refusal, the Company may exercise a right to repurchase any of the offered shares (the "Tertiary Refusal Right"). If the Company declines to exercise that right, the Stockholders that have already exercised their right of refusal may purchase any remaining outstanding shares on offer. If any shares remain on offer once this process is complete, each Stockholder has a right to participate on a pro rata basis in the sale of shares to the third party, and the third party may not purchase any offered shares unless it negotiates to purchase the requisite pro rata share from each of the participating Stockholders.

5

### a. The Notice Requirement

In the event of a "Proposed Transfer"—defined to include any "assignment, sale, offer to sell" and "transfer" of Trux shares by any Stockholder[19]—Section 2.1(b) of the ROFR Agreement provides:

> Each Stockholder proposing to make [the] Proposed Transfer must deliver a Proposed Transfer Notice to the Company, [Viking], each Investor other than [Viking] and each Closing Stockholder not later than sixty (60) days prior to the consummation of such Proposed Transfer.[20]

The Proposed Transfer Notice "shall contain the material terms and conditions (including price and form of consideration) of the Proposed Transfer, the identity of the Prospective Transferee and the intended date of the Proposed Transfer."[21]

> 2.2(b) of the ROFR Agreement provides:

> Each Stockholder proposing to make a Proposed Transfer must deliver a Proposed Transfer Notice to the Company and each Investor not later than sixty (60) days prior to the consummation of such Proposed Transfer.[22]

The content of the Proposed Transfer Notice required by Section 2.2(b) is the same as that required by Section 2.1(b): "Such Proposed Transfer Notice shall contain the material terms and conditions (including price and form of consideration) of the

---

[19] Ex. A § 1.12.

[20] *Id.* § 2.1(b).

[21] *Id.* § 2.1(b).

[22] *Id.* § 2.2(b).

Proposed Transfer, the identity of the Prospective Transferee and the intended date of the Proposed Transfer."[23]

### b. Viking's Special ROFR

Delivery of the Proposed Transfer Notice triggers the waterfall of rights of refusal ("Rights of Refusal"), starting with Viking's Special ROFR. Upon receipt of the Proposed Transfer Notice, Viking has 15 days to exercise the Special ROFR.[24] To exercise that right, Viking must "deliver written notice to the selling Stockholder, the Company, each Investor other than the Viking Investor and each Closing Stockholder . . . specifying the number of shares of Transfer Stock to be purchased."[25] The number of shares that Viking may purchase may not cause its ownership of Trux stock to exceed 49% on a fully diluted basis.[26]

### c. The Investors' Right of First Refusal

Following delivery of the Proposed Transfer Notice, Investors other than Viking likewise have 15 days to exercise their Right of First Refusal to purchase "all or any portion of" the Proposed Transfer shares subject to the Proposed Transfer Notice available for purchase after the exercise of any higher-priority Rights of

---

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.* § 2.1(a).

7

Refusal (such shares, the "Remaining Transfer Stock").[27]  If "any Investor does not provide an Investor Notice exercising its . . . Right of First Refusal with respect to . . . its full pro rata portion of Remaining Transfer Stock subject to a Proposed Transfer, such Investor must deliver a Secondary Notice to the selling Stockholder, the Company and each Closing Stockholder" within that same 15-day time frame.[28]

### d.      The Closing Stockholders' Secondary Refusal Right

Each Closing Stockholder has 30 days from delivery of the Proposed Transfer Notice to provide notice to the Company and the selling Stockholder that it wishes to exercise its Secondary Refusal Right to purchase any Remaining Transfer Stock.[29] If "any Closing Stockholder does not provide [notice] exercising its . . . Secondary Refusal Right . . . such Closing Stockholder must deliver a Tertiary Notice to the selling Stockholder and to the Company" within that 30-day timeframe.[30]

### e.      Rights of Refusal Regarding Any Unsubscribed Stock

The Company possesses a Tertiary Refusal Right to repurchase "all or any portion of the Remaining Transfer Stock not purchased pursuant to Viking's Special ROFR, the Investors' Right of First Refusal or the Closing Stockholders' Secondary

---

[27] *Id.* § 2.2(b).

[28] *Id.* § 2.2(c).

[29] *Id.*

[30] *Id.* § 2.2(d).

Refusal Right."[31] To exercise that right, the Company must provide notice to the selling Stockholder, the Investors, and the Closing Stockholders within ten days after the Closing Stockholders' deadline for delivering the Tertiary Notice—that is, 40 days after delivery of the Proposed Transfer Notice.[32]

In the event any shares of the Remaining Transfer Stock remain undersubscribed after the Company exercises its Tertiary Refusal Right, the Company must then deliver notice to any Stockholders that have exercised their Rights of Refusal (the "Exercising Rightsholders") after an additional five days.[33] The Exercising Rightsholders then have 15 days to "purchase all or any part of the balance of any such remaining unsubscribed shares of Remaining Transfer Stock on the terms and conditions set forth in the Proposed Transfer Notice."[34]

### f. The Co-Sale Process

If any shares subject to the Proposed Transfer Notice are not purchased pursuant to the process outlined above and are "thereafter . . . to be sold" to a third party (a "Prospective Transferee"), the ROFR Agreement gives each Investor and Closing Stockholder the right to participate in the proposed sale of shares to the

---

[31] *Id.*

[32] *Id.*

[33] *Id.* ç 2.2(e).

[34] *Id.*

Prospective Transferee on a pro rata basis (the "Right of Co-Sale").[35] Section 2.3

governs the process for exercising this Right of Co-Sale (the "Co-Sale Process").

Section 2.3(a) requires each Investor or Closing Stockholder that wishes to exercise

its Right of Co-Sale (such Stockholder, a "Participating Rightholder") to give the

selling Stockholder written notice "to that effect within fifteen (15) days after the

deadline for delivery of the Tertiary Notice"—that is, 55 days after delivery of the

Proposed Transfer Notice.[36]

The "terms and conditions of any Proposed Transfer" pursuant to the exercise

of the Right of Co-Sale "will be memorialized in, and governed by" a share purchase

agreement with "customary terms and provisions for such a transaction" (such

agreement, a "Purchase and Sale Agreement").[37] If the Prospective Transferee

refuses to purchase shares from any Participating Rightholder that has exercised its

Co-Sale Right "or upon the failure to negotiate in good faith the Purchase and Sale

Agreement satisfactory to the Participating Rightholders," no other Stockholder may

sell its shares to the Prospective Transferee unless "simultaneously with such sale,

such Stockholder purchases all securities subject to the Right of Co-Sale from such

Participating Rightholder or Rightholders on the same terms and conditions

---

[35] *Id.* § 2.3(a).

[36] *Id.*

[37] *Id.* § 2.3(c).

(including the proposed purchase price) as set forth in the Proposed Transfer Notice."[38]

## 2. Other Pertinent Provisions in the ROFR Agreement

Among other remedies, the ROFR Agreement provides that "[a]ny Proposed Transfer not made in compliance with the requirements of this Agreement shall be null and void ab initio, shall not be recorded on the books of the Company or its transfer agent and shall not be recognized by the Company."[39] Any non-breaching party is "entitled to seek protective orders, injunctive relief and other remedies available at law or in equity (including, without limitation, seeking specific performance or the rescission of purchases, sales and other transfers of Transfer Stock not made in strict compliance with this Agreement)."[40] If any Stockholder "purports to sell any Transfer Stock" in violation of the Right of Co-Sale of any Participating Rightholder, the Participating Rightholder may "require such Stockholder to purchase from such Participating Rightholder the type and number of shares of Capital Stock that such Participating Rightholder would have been entitled to sell to the Prospective Transferee had the Prohibited Transfer been effected in compliance" with the Co-Sale Process.[41]

---

[38] *Id.* § 2.3(e).

[39] *Id.* § 2.4(a).

[40] *Id.*

[41] *Id.* § 2.4(c).

11

The ROFR Agreement may be "amended, modified or terminated . . . and the observance of any term thereof may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a written instrument" executed by the Company, Viking, and Stockholders holding a majority of Company stock.[42] Any "amendment, modification, termination or waiver" will be binding "upon the Company, the Investors, the Stockholders" and any of their assignees or successors in interest.[43] "The Company shall give prompt written notice of any amendment, modification or termination hereof or waiver hereunder to any party hereto that did not consent in writing to such amendment, modification, termination or waiver."[44]

Separately, a non-breaching party may provide a "waiver, permit, consent or approval of any kind or character" (a "Waiver") to a breaching party, but the Waiver "must be in writing."[45] Waiver "of any single breach or default" shall not operate as "a waiver of any other breach or default theretofore or thereafter occurring."[46]

---

[42] *Id.* § 6.8.

[43] *Id.*

[44] *Id.*

[45] *Id.* § 6.7.

[46] *Id.*

## C.     The Transactions at Issue and Gower's Objections

In February 2020, Trux's Board terminated Gower as Trux's CEO—the result, Gower alleges, of a "coordinated campaign to push [him] out"[47] by certain other stockholders that disagreed with his decision to seek venture capital funding and instead wanted a quick sale of the Company.[48]  Gower alleges that he owned approximately 6.1% of Trux stock but that a portion of that equity was subject to vesting.[49]  Trux asserted that Gower was terminated "for cause," which "result[ed] in a purported redemption of Gower's unvested equity for an amount far less than fair market value."[50]  Gower maintains that he contested and intended to mount a legal challenge to his termination and the redemption of his unvested equity.[51]

On March 13, 2020, Gower received an email from Bart Ronan, his successor as Trux's CEO, informing Gower as a Trux Stockholder that the Board had approved an offer by Viking to acquire all the outstanding shares of Trux.[52]  The email included a form of a proposed written consent to be executed by Stockholders pursuant to Section 228 of the Delaware General Corporation Law (the "Written

---

[47] Compl. ¶ 2.

[48] *Id.* ¶¶ 21–26.

[49] *Id.* ¶ 18.

[50] *Id.* ¶ 27.

[51] *Id.* ¶ 28.

[52] *Id.* ¶ 30; *see* Ex. B.

Consent").[53]  The email requested that Gower sign and return a copy of the signature page of the Written Consent by the close of business on March 17, 2020.[54]  Among other recitals, the Written Consent acknowledges:

> Pursuant to Section 2.2 of the Right of First Refusal and Co-Sale Agreement . . . if any Stockholder (the "Transferring Stockholder") proposes to transfer any of its shares of capital stock of the Company, such Transferring Stockholder shall first give notice and offer such shares of capital stock of the Company to the Investors and Closing Stockholders . . . .[55]

The Written Consent defines this right as the "Right of First Refusal."[56]  The Written Consent provides that the "Stockholders hereby ratify, waive and forever release all of the Stockholders' rights to the Right of First Refusal in connection with the Transaction."[57]  Gower's counsel informed Trux's counsel that Gower would not be executing the Written Consent and asked to review a definitive share purchase agreement "so that any issues relating to [Gower's] potential claims can be dealt with in an appropriate and timely fashion."[58]

On April 1, 2020, Gower received another email from Ronan informing him as a Trux Stockholder that "Viking has entered into agreements to acquire shares of

---

[53] Ex. B.

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] Compl. ¶ 33; Ex. C.

14

the Company's capital stock" with each of the Moving Sellers (such transactions, together, the "Share Sales").[59] The email stated that the Moving Sellers' shares, together with Viking's existing stake, "represent a majority of the Company's issued and outstanding shares of capital stock."[60] The email gave Gower 15 days—until April 16, 2020—to return a signed copy of an enclosed Purchase and Sale Agreement (the "Proposed PSA") to sell 809,994 shares to Viking pursuant to Section 2.3 of the ROFR Agreement.[61] The Proposed PSA gave Gower a choice as to the form of consideration.[62] Under "Option A," Gower would receive a portion of the consideration in a cash payment at closing and the rest in the form of a promissory note maturing on July 1, 2021.[63] As described in Ronan's April 1 email, under Option A Gower would receive "$1.18 per share, with $0.52 per share paid at the closing of such transaction (the 'Closing') and $0.66 per share payable no later than July 1, 2021."[64] Under "Option B," Gower would receive the entire consideration up front in the form of a cash payment of $0.92 per share.[65]

---

[59] Ex. F.

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] *Id.*

15

Gower maintains that the terms of the Proposed PSA were "problematic" for him given the legal issues arising from his termination.[66] Gower cites to Section 5(a) of the Proposed PSA, which required him to represent and warrant that he owned 809,994 shares of Trux stock rather than the 1,439,989 shares that Gower maintains he owned or to which he was otherwise entitled.[67] Gower also alleges that the Proposed PSA contained a release of claims that "would have extinguished Gower's right to pursue any and all claims arising from his termination."[68] When Gower's counsel asked for copies of the agreement executed by the Moving Sellers, Viking's counsel did not provide the copies but responded that Gower "received the same offer" as the Moving Sellers and that the "only differences between those documents and Jeff Gower's is the names, number of shares and the option A/option B choice that is in Jeff Gower's (the other 3 just had option A)."[69]

Gower alleges that Viking's original March 12 offer was "either withdrawn or rejected" and that Viking instead entered into direct negotiations with the Moving Sellers to acquire their shares.[70] Gower also alleges that the ROFR Agreement was

---

[66] Compl. ¶ 45.

[67] *Id.*

[68] *Id.*

[69] Ex. H.

[70] Compl. ¶ 35.

never "waived or otherwise amended in connection with the agreements referenced in Ronan's April 1, 2020 email."[71]

On April 16, 2020, Gower's counsel informed the Moving Sellers and Viking's counsel that Gower "wishes to exercise his rights under the [ROFR] Agreement" and that the Share Sales were "null and void" because: (1) "Gower was never provided with a Proposed Transfer Notice," (2) the "proposed Purchase and Sale Agreement provided to Mr. Gower substantially understates his ownership interest," and (3) "there has been a failure to 'negotiate in good faith a Purchase and Sale Agreement satisfactory to [Mr. Gower].'"[72] Viking's counsel responded the next day that "Gower was offered the same deal that each other [Stockholder] was provided" and that the number of Gower's shares to be sold under the Proposed PSA reflected Trux's official records.[73] Viking's counsel also extended Gower's deadline to respond to Viking's offer to the end of day on April 20, 2020.[74] Gower never executed the Proposed PSA.

---

[71] *Id.* ¶ 41.

[72] Ex. I; Ex J.

[73] Ex. K.

[74] *Id.*

## D.    Procedural History

On November 19, 2020, Gower filed his Verified Complaint.[75]  Trux, Viking, and the Moving Sellers filed motions to dismiss the Verified Complaint.[76]  On April 23, 2021, Gower filed an Amended Verified Complaint, which I refer to as the "Complaint."[77]  On May 24, 2021, Trux, Viking, and the Moving Sellers separately moved to dismiss the Complaint.[78]  On June 16, 2021, Richard filed a motion for leave to intervene as a Defendant.[79]  The court granted the motion on July 9, 2021.[80]  Richard has not moved to dismiss the Complaint.[81]  After briefing, the court heard oral argument via remote video on November 8, 2021.[82]

---

[75] Dkt. 1.

[76] Dkt. 19–20.

[77] Dkt. 22.

[78] Dkt. 25–27.

[79] Dkt. 31.

[80] Dkt. 34.

[81] Instead, Richard has filed an answer and a "counterclaim."  Dkt. 39.  In his counterclaim, Richard "requests that if the Court enters the judgment Gower requests declaring 'the transfer of stock to Viking is 'null and void ab initio,' that the Court declare that [Richard]'s sale of 4,958,848 shares of Trux stock to Viking on April 7, 2020 is also 'null and void.'" *Id.* at 21.  On August 19, 2021, Viking filed an answer to the counterclaim, seeming to question whether it is appropriately styled as a counterclaim rather than as a cross-claim. Dkt. 52 at 1.  The Moving Sellers, Viking, and Gower have not responded to Richard's counterclaim.  On August 19, 2021, Trux moved to dismiss Richard's counterclaim on the same grounds it has sought to dismiss Gower's claim for a declaratory judgment.  Dkt. 51. On September 22, 2021, Richard and Trux filed a proposed order stipulating that Richard had not brought any claims against Trux and withdrawing Trux's motion to dismiss as moot.  Dkt. 56.  The court granted the proposed order on the same day.  Dkt. 57.

[82] Dkt. 65.

18

## II. ANALYSIS

The Complaint contains three counts. Count I is a claim for declaratory judgment that the transfer of stock from the Moving Sellers to Viking is void. Count II is a breach of contract claim. Count III alleges that the Moving Sellers breached the implied covenant of good faith and fair dealing. The Complaint alleges, and no party contests, that the court has subject matter jurisdiction over the claims under 8 *Del. C.* 111.[83]

### A. Standard of Review

On a motion to dismiss for failure to state a claim under Court of Chancery Rule 12(b)(6), (a) all well-pleaded factual allegations are accepted as true; (b) even vague allegations are well-pleaded if they give the opposing party notice of the claim; and (c) the court must draw all reasonable inferences in favor of the non-moving party. *Savor, Inc. v. FMR Corp.,* 812 A.2d 894, 896-97 (Del. 2002). "[D]ismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof." *Id.* (internal quotations omitted). To make this determination, the Court "is not required to accept every strained interpretation of the allegations" the plaintiff proposes, but "only those reasonable inferences that logically flow from the face of the complaint."

---

[83] 8 *Del. C.* § 111(a)(3) confers upon the court the authority to "interpret, apply, enforce or determine the validity of the provisions of . . . [a]ny written restrictions on the transfer, registration of transfer or ownership of securities under §202 of this title."

19

*Roma Landmark Theaters v. Cohen Exhibition Co.*, 2020 WL 5816759, at \*7 (Del. Ch. Sept. 30, 2020) (quoting *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006)). "[A] claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law." *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

Plaintiff's declaratory judgment claim is dependent upon the success of his claims for either breach of contract or breach of the implied covenant of good faith and fair dealing. Therefore, I first address the breach of contract and implied covenant claims.

### B. Gower Has Adequately Alleged that the Share Sales Were the Product of a Breach of Contract.

Count II alleges that the Moving Sellers breached their obligations under the ROFR Agreement to provide Gower written notice of the terms and conditions of the Share Sales "not later than sixty (60) days prior to the consummation of such Proposed Transfer."[84] As a result, Gower maintains, the Share Sales were "not made in compliance" with the requirements of the ROFR Agreement.[85]

Under Delaware law, "the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) a

---

[84] Pl.'s Ans. Br. to Viking 11 (quoting Ex. A § 2.1).

[85] *Id.* at 10–11; Compl. ¶¶ 56–57 (quoting Ex. A § 2.4).

resulting damage to the plaintiff." *Skye Min. Invs., LLC v. DXS Cap. (U.S.) Ltd.*, 2020 WL 881544, at *14 (Del. Ch. Feb. 24, 2020). "When addressing whether a plaintiff has well pled the first two elements, the court must consider, and often construe, the proffered contract at the heart of the claim of breach." *Id.*

In Delaware, the construction of contract language presents a question of law. *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). The court's "task is to fulfill the parties' shared expectations at the time they contracted." *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 2019 WL 1965888, at *6 (Del. May 2, 2019) (internal quotation marks and alterations omitted). The court starts with the text of the contract. *Sunline Comm'l Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019). When a contract's language is clear and unambiguous, the court will give effect to the plain meaning of the contract's terms and provisions. *Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010). The contract is to be read as a whole, giving effect to each term and provision, so as not to render any part of the contract mere surplusage. *Id.* at 1159. "If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract, or to create an ambiguity." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). If, however, the contract is ambiguous, the court may consider extrinsic evidence to determine the parties' intent. *Sunline Comm'l*

21

*Carriers*, 206 A.3d at 847.  But "[a] contract is not rendered ambiguous simply because the parties do not agree upon its proper construction."  *Rhone-Poulenc*, 616 A.2d at 1196.

## 1. The Complaint Alleges the Moving Sellers Failed to Comply with the Notice Requirement of the ROFR Agreement.

Section 2.1(b) of the ROFR Agreement plainly and unambiguously imposes an obligation on "each Stockholder proposing to make a Proposed Transfer" to provide notice to "each Closing Stockholder not later than sixty (60) days prior to the consummation of such Proposed Transfer" (the "Notice Requirement").[86]  There is no dispute that the Moving Sellers were Stockholders or that Gower was a Closing Stockholder.  The definition of "Proposed Transfer" applies to any "transfer"[87] of shares, and the definition of "Prospective Transferee" covers "any person" and thus also Viking.[88]  As this court has recognized, the plain meaning of the term "consummate" in the context of business transactions "refers to closing"—the time when the transactions contemplated by the agreement have been "completed." *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 138–39 (Del. Ch. 2009).  When the Moving Sellers agreed to sell their shares to Viking, they had "proposed"

---

[86] Ex. A § 2.1(b).

[87] *Id.* § 1.12.

[88] *Id.* § 1.14.

to make a "Proposed Transfer," triggering an obligation to provide Gower with at least 60 days' notice before the Share Sales closed.

The Moving Defendants concede that the ROFR Agreement required the Moving Sellers to provide Closing Stockholders with 60 days' notice of the Proposed Transfer to Viking.[89] The Moving Defendants argue, however, that notice was only required to be provided to those Closing Stockholders that were seeking to "exercise primary, secondary, and tertiary first-refusal rights" and that "there is no suggestion in the . . . Complaint that Gower wanted to exercise—or could have exercised—any of those *first-refusal* rights."[90] This position relies on the theory that the ROFR Agreement conditions the Notice Requirement on a Closing Stockholder's desire or ability to exercise its Right of Refusal. Because Gower was looking only to exercise a Co-Sale Right, this argument runs, he was entitled to only 15 days' notice under Section 2.3.

---

[89] Although Section 2.2(b), unlike Section 2.1(b), does not expressly provide that Closing Stockholders are entitled to 60 days' notice, the Moving Defendants have proceeded as though 60 days' notice was required to be provided to Closing Stockholders under both provisions. *See* Viking Opening Br. 4 ("Subsections 2.1 and 2.2 of the ROFR Agreement require each 'Stockholder proposing to make a Proposed Transfer' to 'deliver a Proposed Transfer Notice to [Trux], [Viking], each Investor other than [Viking] and *each Closing Stockholder* not later than sixty (60) days prior to the consummation of such Proposed Transfer.'")(emphasis added); Moving Sellers' Opening Br. at 4 (adopting and incorporating by reference "the arguments stated in the Viking Brief").

[90] Viking Opening Br. 14.

This proposed limitation on the scope of the Notice Requirement in Section 2.1(b) is contrary to the plain meaning of the contract. When construing a contract, the court must give effect to all its provisions. *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (internal quotation marks omitted). While "general terms of the contract must yield to more specific terms," *Sunline Com. Carriers*, 206 A.3d at 846, the "meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan." *Riverbend Cmty., LLC v. Green Stone Eng'g, LLC*, 55 A.3d 330, 335 (Del. 2012). The Moving Defendants' sole textual basis for limiting the scope of the Notice Requirement is that the requirement "is found in the two subsections governing the right of first refusal."[91] The implication of this position is that even though Section 2.1(b) on its face requires 60 days' notice "to the Company, [Viking], each Investor other than [Viking] and each Closing Stockholder," the Notice Requirement only applies to Viking because Section 2.1 governs the Special ROFR right which only Viking possesses. That interpretation would render the bulk of the Notice Requirement in Section 2.1 mere surplusage and is not reasonable. Moving Defendants thus point to nothing in the text of ROFR Agreement that would justify limiting the scope of the Notice Requirement in the manner they propose.

---

[91] *Id.*

24

Moving Defendants' atextual limitation would also undermine the structure of the contract. The unequivocal language of the Notice Requirement reflects the intent of the parties to structure the Rights of Refusal around requirements that facilitate the flow of information downstream. *See Union Oil Co. of California v. Mobil Pipeline Co.*, 2006 WL 3770834, at *13 (Del. Ch. Dec. 15, 2006) (observing that "communication is one of the primary concerns" of a stockholders' agreement containing similar right of first refusal provisions, "as illustrated by the fact that it is structured around the ROFR Notice"). Gower's ability to exercise his Co-Sale Right, moreover, was tethered to the exercise by other Stockholders of their Rights of Refusal because the Co-Sale Right only vests "if any Transfer Stock subject to a Proposed Transfer is not purchased pursuant to Subsections 2.1 and 2.2."[92] The Moving Defendants' interpretation of these provisions would instead make notice conditional upon the downstream actions of the contract parties. That gets things backwards and would rewrite the core mechanism by which the contract initiates the waterfall of Rights of Refusal and upon which the entire Sales Process hinges.

The Moving Sellers also take an even more extreme position, arguing that Gower was not entitled to even 15 days' notice because he never provided notice of his interest in selling his shares under Section 2.3(a).[93] Section 2.3(a) requires a

---

[92] Ex. A § 2.3(a).

[93] Moving Sellers' Opening Br. 7.

Closing Stockholder to provide the requisite notice to *exercise* its Co-Sale Right; nothing in the provision conditions Gower's right to receive notice on his taking any affirmative actions. Moreover, for a Closing Stockholder to be able to provide requisite notice of its interest in a transaction, the Closing Stockholder must know about the transaction in the first place. Conditioning the Notice Requirement upon a declaration of interest from *Gower* would not only contradict the Notice Requirement but would also undermine the contract's basic structure. That is not a reasonable interpretation of Section 2.3(a). *See Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *9 (Del. Ch. Sept. 18, 2014) (observing that the court "should avoid interpreting a term in an unreasonable way that would yield an absurd result or that would render other contractual language superfluous").

### 2. The Complaint Adequately Pleads that the Moving Sellers Failed to Provide Gower with Requisite Notice.

Gower alleges that, when he received notice of the Share Sales on April 1, 2020, the Moving Sellers "had . . . already purported to transfer their Trux stock to Viking."[94] The Moving Defendants do not argue otherwise. Gower is therefore entitled to the pleadings-stage inference that the Share Sales had already closed or

---

[94] Compl. ¶ 5.

26

would close sooner than 60 days from the announcement of the transactions on April 1, 2020.[95]

The Moving Defendants insist that even if Gower was not provided with the contractually mandated notice of the Proposed Transfer, the Notice Requirement was waived pursuant to a written stockholder consent.[96] This argument fails for several independent reasons.

Waiver is an affirmative defense. *Medek v. Medek*, 2008 WL 4261017, at *10 (Del. Ch. Sept. 10, 2008). "To prove waiver, Defendants must prove Plaintiff voluntarily and intentionally relinquished a known right." *Id.* There is no executed waiver in the record. All that the Complaint shows is that Trux asked the Stockholders to execute a form of Written Consent on March 12, 2020. The Written

---

[95] The stock purchase agreements governing the Share Sales between the Moving Sellers and Viking are not in the record. Trux and Viking refused to provide copies of those agreements to Gower's counsel. *See* Ex. G (Trux's counsel informing Gower's counsel that "the Company has instructed us not to do so"); Ex. H (Viking's counsel describing but failing to provide the agreements).

[96] Viking Opening Br. 12 ("The Amended Complaint also shows that a majority of Trux's Stockholders waived the notice provision Gower now claims was breached."); *see also id.* at 15 ("a majority of the Stockholders 'waive[d] and forever release[d] all of the Stockholders' rights to the Right of First refusal in connection with the Transaction'— including the right to 'notice' of the transaction"); *id.* ("That waiver forecloses any potential obligation to provide Gower with notice under subsections 2.1(b) or 2.2(b)."); *id.* ("Gower tries to circumvent that waiver . . . ."); *id.* at 17 ("Gower could not prevail on his lack-of-notice claim because Trux, Viking, and a majority of the Stockholders approved the transaction. While the ROFR Agreement contemplates a 60-day notice period to allow for various first refusal rights, the parties to that ROFR Agreement later 'authorize[d], approve[d], and consent[ed] to' the 'transactions contemplated by the Term Sheet.'" (emphasis omitted)).

Consent purports to "Resolve" that Stockholders "waive and forever release all of the Stockholders' rights to the Right of First Refusal in connection with the Transaction."[97] The Transaction to which the Written Consent refers is reflected in an attached Term Sheet wherein Viking proposed to purchase all of the Company's outstanding shares for "approximately $.9928 per share of common stock."[98] An unsigned Written Consent, which does not reflect that it was executed by stockholders owning a majority of the Company's outstanding common stock, does not satisfy the Moving Defendants' burden on a motion to dismiss. *See Allen v. Prime Computer, Inc.*, 540 A.2d 417, 420 (Del. 1988) ("[F]or there to be valid stockholder action under § 228 written consents must be signed by holders of a majority of the outstanding voting shares.").

Even if the proposed Written Consent had been executed,[99] Gower's allegations support a reasonable inference that the Written Consent's waiver of the Notice Requirement did not extend to the Share Sales. Section 6.8 of the ROFR

---

[97] Ex. B.

[98] *Id.*

[99] The unsigned March 12, 2020 Written Consent states that it is a written consent pursuant to Section 228 of the Delaware General Corporation Law. Ex. B. The statute requires that action by less than unanimous written consent be provided to non-consenting stockholders. 8 *Del. C.* § 228 (e) ("Prompt notice of the taking of the corporation action without a meeting by less than unanimous consent shall be given to those stockholders . . . who have not consented and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting . . . ."). None of the Defendants has contended that any such notice was provided to Gower or any other non-consenting Stockholder.

Agreement provides that "[n]o waivers of or exceptions to any term, condition or provision of this Agreement, in any one or more instances, shall be deemed to be, or construed as, a further or *continuing waiver* of any such term, condition or provision."[100] The well-pleaded allegations of the Complaint support a reasonable inference that the transaction proposed on March 12, 2020 to which the Written Consent applied was different from the actual Share Sales between Viking and the Moving Sellers.[101] Pursuant to the transaction proposed on March 12, 2020, Viking would purchase "all the outstanding shares . . . of capital stock held by all shareholders" for a price share of approximately $0.99 per share.[102] Viking's proposal indicated that it would "expire" on March 18, 2020, and that Viking expected the "transaction can be closed on or before March 31, 2020."[103] Contrast

---

[100] Ex. A § 6.8(a) (emphasis added).

[101] Compl. ¶ 35. Viking's argument that Gower understood that "there was already sufficient shareholder approval of the Stockholder Consent," Viking Reply Br. 6, overstates an email exchange between Gower's counsel and the Company's counsel. In that email, Gower's counsel recounts their call from the prior evening. Gower's counsel stated: "To confirm, given your belief that there is no need for Mr. Gower to execute the Stockholder Consent (because there is already sufficient shareholder approval) and our concern with some of the language in the document, Mr. Gower will not be executing the Stockholder Consent." Ex. C. The fact that Gower's counsel was told that "there is already sufficient shareholder approval" does not establish the fact that there *was* sufficient approval, or that the Written Consent pertained to the transaction described in the April 1, 2020 email. *Id.*

[102] Ex. B.

[103] *Id.*

that with Ronan's representations in the April 1, 2020 email.[104] That email, stating that Viking had entered into agreements to purchase the shares of the Moving Sellers, offered different terms than the March 12, 2020 proposal. The April 1, 2020 proposal gave Gower two options: he could either sell his shares for $1.18 per share—with $0.66 of that amount payable over 15 months—or for $0.92 per share in a single up-front cash payment.[105] It is reasonable to infer for pleadings-stage purposes that Viking's initial proposal contemplated a different transaction and terms than that of April 1. When the Moving Sellers accepted Viking's offer to purchase their shares, they thereby proposed a different transaction to which the purported waiver did not apply.

Moving Defendants also argue that, as a practical matter, Gower had enough time to evaluate Viking's proposal and therefore received the benefit of the notice provisions. "When confronted with less than literal compliance with a notice provision, courts have required that a party substantially comply with the notice provision. The requirement of substantial compliance is an attempt to avoid harsh results . . . where the purpose of these [notice] requirements has been met." *Gildor*, 2006 WL 4782348, at *7 (internal quotation marks omitted). But the Moving Defendants do not argue that the Moving Sellers attempted but failed to provide

---

[104] Ex. F.

[105] *Id.*

Gower with 60 days' notice. The facts alleged in the Complaint indicate that the Moving Sellers made no such effort. The Moving Defendants now maintain the Moving Sellers did not *need* to try because Gower was only entitled to, at most, 15 days' notice. That argument is entirely inconsistent with the terms of the ROFR Agreement.

For these reasons, the Complaint contains well-pleaded allegations that the Moving Sellers breached the Notice Requirement in the ROFR Agreement. The motion to dismiss Count II is therefore denied.

### C. The Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing Is Duplicative of the Breach of Contract Claim and Is Dismissed.

Count III alleges a breach of the implied covenant of good faith and fair dealing against the Moving Sellers for failure to provide notice consistent with the Notice Requirement of Section 2.1. The implied covenant of good faith and fair dealing inheres in every contract governed by Delaware law and requires "a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (quoting *Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 159 (Del. Ch. 1995) (internal quotation marks omitted)). "[T]he implied covenant only applies where a contract lacks specific language governing an issue and the obligation the court is

asked to imply advances, and does not contradict, the purposes reflected in the express language of the contract." *Alliance Data Sys. Corp. v. Blackstone Cap. P'rs V L.P.,* 963 A.2d 746, 770 (Del. Ch.), *aff'd,* 976 A.2d 170 (Del. 2009). "The doctrine thus operates only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer." *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009). "[T]he covenant is a limited and extraordinary legal remedy. As such, the implied covenant does not apply when the contract addresses the conduct at issue, but only when the contract is truly silent concerning the matter at hand." *Oxbow Carbon & Minerals Hldgs., Inc. v. Crestview-Oxbow Acquisition, Inc.*, 202 A.3d 482, 507 (Del. 2019) (cleaned up).

"Because express contractual provisions 'always supersede' the implied covenant, an implied covenant claim will not survive a motion to dismiss if it duplicates breach of contract claims." *Bandera Master Fund LP v. Boardwalk Pipeline P'rs, LP*, 2019 WL 4927053, at *22 (Del. Ch. Oct. 7, 2019). In his answering brief, Gower clarifies that he asserts his breach of the implied covenant claim in the alternative, in the event the court were to determine that the Complaint failed to state a claim for breach of contract.[106] Because the court has determined

---

[106] Pl.'s Ans. Br. to Moving Sellers 11–12.

that Count II states a claim for breach of contract, the implied covenant claim is "duplicative and not viable." *Edinburgh Hldgs., Inc. v. Educ. Affiliates, Inc.*, 2018 WL 2727542, at *9 (Del. Ch. June 6, 2018). As such, the claim "fails as a matter of law and must be dismissed." *Id.*

## D. Plaintiff Has Stated a Claim for Declaratory Relief.

Count III seeks a declaratory judgment that the Share Sales are void. Gower argues that the failure to provide the contractually mandated notice under the ROFR Agreement renders any non-compliant transaction void under Section 2.4: "Any Proposed Transfer not made in compliance with the requirements of this Agreement *shall be null and void ab initio*, shall not be recorded on the books of the Company or its transfer agent and shall not be recognized by the Company."[107] Moving Defendants do not dispute that the notice requirements in the ROFR Agreement constitute "requirements" for purposes of Section 2.4.

Defendants raise three arguments specific to Gower's declaratory judgment claim. First, the Moving Defendants argue that the court should dismiss the claim on equitable grounds because Gower waited too long to seek a declaratory judgment. Second, the Moving Defendants argue that Gower is not entitled to declaratory relief

---

[107] Ex. A § 2.4(a) (emphasis added).

33

because he has not alleged harm to his stock. Third, Trux argues that it should be dismissed from this action because it is not a proper party.

The Declaratory Judgment Act, 10 *Del. C.* § 6501 *et seq.*, gives the court the power to issue declaratory judgments. A declaratory judgment is a creature of statute and "not a purely equitable remedy." *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 985 (Del. Ch. 2016). When "declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding." 10 *Del. C.* § 6511. This court has found occasion not to dismiss a declaratory judgment claim where the defendant's "interest in the controversy" was not "so attenuated that it could not properly have been named as a defendant." *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2737409, at *14 (Del. Ch. July 14, 2008).

The court's power to issue declaratory judgments is limited by the well-settled principle that a declaratory judgment must "address an actual controversy between parties with affected rights." *Lynch v. Gonzalez*, 2020 WL 5648567, at *6 (Del. Ch. Sept. 22, 2020). For the case or controversy requirement to be satisfied:

> (1) [The case] must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; [and] (4) the issue involved in the controversy must be ripe for judicial determination.

34

*Rollins Int'l, Inc. v. Int'l Hydronics Corp.*, 303 A.2d 660, 662–63 (Del. 1973). The case or controversy requirement serves to ensure that an "application for declaratory relief" does not turn into "a contingent, speculative venture that would require the Court to issue an advisory opinion." *K&K Screw Prod., L.L.C. v. Emerick Cap. Invs., Inc.*, 2011 WL 3505354, at *9 (Del. Ch. Aug. 9, 2011). Even when the requirement is met, the court may dismiss a defendant if it would be "inequitable for this Court to require [the defendant] to remain as a defendant in [the] action." *Sprint Nextel Corp.*, 2008 WL 2737409, at *14.

### 1. Moving Defendants' Thinly Veiled Laches Argument Cannot Be Decided at this Stage.

Moving Defendants argue that the court should exercise its discretion to deny Gower a declaratory judgment on equitable grounds. Declaratory judgment would be inequitable, Moving Defendants aver, because Gower waited 232 days to file his lawsuit and unwinding the Share Sales would cause substantial prejudice to the Moving Defendants and Trux.[108] Moving Defendants' appeal to equity and the exercise of discretion is nothing short of a laches defense. "[D]ismissal of the complaint based upon an affirmative defense is inappropriate" under Delaware law "[u]nless it is clear from the face of the complaint that an affirmative defense exists and that the plaintiff can prove no set of facts to avoid it." *Reid v. Spazio*, 970 A.2d

---

[108] *Id.* at 27–28.

35

176, 183–84 (Del. 2009). "[L]aches generally requires proof of three elements: first, knowledge by the claimant; second, unreasonable delay in bringing the claim; and third, resulting prejudice to the defendant." *Whittington v. Dragon Grp., L.L.C.*, 991 A.2d 1, 8 (Del. 2009) (quoting *Reid*, 970 A.2d at 182–83) (cleaned up). Whether Gower unreasonably delayed in filing his complaint and whether the Moving Defendants and Trux would suffer prejudice due to Gower's inaction is a factual question to be resolved at a later stage in the proceedings. *See Reid*, 970 A.2d at 183 ("In ruling on a motion to dismiss under Court of Chancery Rule 12(b)(6), the Court is generally limited to facts appearing on the face of the pleadings. Accordingly, affirmative defenses, such as laches, are not ordinarily well-suited for treatment on such a motion."). In that regard, the Moving Defendants do not address Gower's argument that any claim of unreasonable delay fails under the express terms of the contract. Section 6.7 provides that "no delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party."[109] "Delaware courts do not lightly trump the freedom to contract and, in the absence of some countervailing public policy interest, courts should respect the parties' bargain." *Gildor*, 2006 WL 4782348, at *11. I need not definitively decide the

---

[109] Ex. A § 6.7.

applicability of that provision on this motion. The parties have not fully briefed it. For present purposes, it is not "clear from the face of the complaint that an affirmative defense exists and that the Plaintiff can prove no set of facts to avoid it." *Reid*, 970 A.2d at 183. In any event, it is premature for me to deny the Plaintiff the discretionary remedy of declaratory relief based upon a thinly veiled laches defense on a motion to dismiss.

### 2. Gower's Request for an Alternative Remedy of Damages Does Not Compel Dismissal of His Request for Relief.

Moving Defendants argue that Gower is not entitled to declaratory judgment because Gower has not alleged any "damage to the value of his holding resulting from the transaction."[110] The Moving Defendants confuse the arguments and the relief sought in the Complaint. Plaintiff seeks a declaratory judgment that the Share Sales are void under the ROFR Agreement.[111] Damages is sought "[i]n the alternative."[112] Moving Defendants, as parties to the ROFR Agreement, ignore that they have already stipulated that "any breach of this Agreement would result in substantial harm to the other parties hereto *for which monetary damages alone could not adequately compensate.*"[113] Gower's claim requires a "determination of rights

---

[110] Viking Opening Br. 11.

[111] Compl. ¶ 6.

[112] *Id.* ¶ 7.

[113] Ex. A § 2.4(a) (emphasis added).

as between the defendant and . . . other stockholders as to their respective interests in the corporation's assets." *Highlights for Child., Inc. v. Crown,* 193 A.2d 205, 207 (Del. Ch. 1963). As a party to the ROFR Agreement, Gower has an interest in resolving the question of whether the Share Sales were invalid and to know from whom he has a right to purchase shares (and to whom he may sell his shares) under the agreement.[114]

### 3. Is Trux a Proper Defendant in this Action?

Trux argues that it is not a proper party to this action because it "has no stake in the outcome of this case and any declaratory relief that could be awarded does not relate in any way to Trux's actions or interests."[115]

In support of that proposition, Trux cites two cases. In *Lynch v. Gonzalez*, the court held that a Delaware limited liability company lacked standing to prosecute a declaratory judgment claim as to the validity of a purported share transfer between two of its stockholders. 2020 WL 5648567, at *7. The court so held because the

---

[114] Moving Defendants also argue that Gower's declaratory judgment claim should be dismissed because Gower's dispute is "over Gower's termination and the redemption of his unvested shares." Viking Opening Br. 26–27. But Gower asserts no such claim and seeks no corresponding relief in this action. Pl.'s Ans. Br. to Viking 20. The mere fact that Gower may have legal rights related to his termination under a different agreement has no bearing on whether he may bring claims under the ROFR Agreement. As the "master of [his] complaint," Gower "can choose what [he] wants to plead." *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016), *abrogated on other grounds*, 214 A.3d 933 (Del. 2019).

[115] Trux Opening Br. 3.

plaintiff was not involved in the transfer and had not "suffered any cognizable harm from the purported private transfer." *Id.* *Lynch* relied on *SolarReserve CSP Holdings, LLC v. Tonopah Solar Energy, LLC*, in which the court held that the plaintiff lacked standing to bring breach of contract claims under an LLC agreement because it had assigned its "right, title, and interest in and to all actions" against the defendant to a third party. 2020 WL 4251968, at *4 (Del. Ch. July 24, 2020), *order vacated, appeal dismissed*, 258 A.3d 806 (Del. 2021), *vacated*, (Del. Ch. 2021), *order vacated, appeal dismissed*, 258 A.3d 806 (Del. 2021). "As such," the court held, "SolarReserve would not be the beneficiary of any relief that might be achieved in this action." *Id.*

Gower first argues that these cases are not applicable because, unlike the parties without standing in *Lynch* and *SolarReserve*, Trux is a defendant and not a plaintiff in this action.[116] The court in *Lynch* made clear, however, that it was addressing the third prong of the case or controversy requirement—that "the controversy *must be between parties whose interests are real* and adverse." *Lynch*, 2020 WL 5648567, at *7 (emphasis in the original). That prong applies to plaintiffs and defendants alike. *See K&K Screw Prod.*, 2011 WL 3505354, at *8 (discussing whether defendant had an interest that was "real and adverse" to the plaintiff "in

---

[116] Pl.'s Ans. Br. to Trux 4.

contesting this action"). *Lynch* therefore supports the proposition that a corporation has no real and adverse interest in a declaratory judgment action between its stockholders if it "does not hold any rights [or obligations] at issue in the dispute" or does not stand to receive "the fruits of the purported bargain." *Lynch*, 2020 WL 5648567, at *6 n.52.

Gower's other argument is more persuasive. Gower argues that Trux *does* have a stake in this dispute because Trux is a party to the ROFR Agreement and because judgment for the Plaintiff would impose an obligation on Trux.[117] The ROFR Agreement provides that "[a]ny Proposed Transfer not made in compliance with the requirements of this Agreement shall be null and void ab initio, shall not be recorded on the books of the Company or its transfer agent and shall not be recognized by the Company."[118] The Declaratory Judgment Act provides that, when "declaratory relief is sought, *all persons shall be made parties who have or claim any interest which would be affected by the declaration*, and no declaration shall prejudice the rights of persons not parties to the proceeding." 10 *Del. C.* § 6511 (emphasis added). The statute thus codifies

> [Equity]'s fundamental principle concerning parties . . . that all persons in whose favor or against whom there might be a recovery, however partial, and also all persons who are so interested, although indirectly, in the subject-matter and the relief granted, that their rights or duties

---

[117] *Id.* at 3–4.

[118] Ex. A § 2.4(a).

might be affected by the decree, although no substantial recovery can be obtained either for or against them, shall be made parties to the suit.

*Sprint Nextel*, 2008 WL 2737409, at \*13 (emphasis omitted) (quoting 1 Pomeroy's Equity Jurisprudence § 114 (5th ed. 1941). [119] It is not the case that Trux has *no* interest in the outcome of this dispute.[120]

Trux argues that it is not named as merely a nominal defendant, and should not be subjected to discovery and other expenses as if it were an adversarial party.[121] That argument misses the mark. First, it is inevitable that Trux will be subjected to discovery in this case, either through discovery as a party or through a subpoena. Second, as a practical matter, it became apparent through the briefing and argument

---

[119] Trux argues that Gower's dispute as to Trux is purely hypothetical, relying on *Boilermakers Local 154 Retirement Fund v. Chevron Corp.*, 73 A.3d 934 (Del. Ch. 2013). In *Boilermakers*, plaintiffs challenged forum selection clauses in corporate bylaws, presenting the court with "purely hypothetical situations in which they sa[id] that the bylaws of Chevron and FedEx might operate unreasonably." *Id.* at 940. The court refused to consider the hypothetical scenarios, explaining "it would be imprudent and inappropriate to address these hypotheticals in the absence of a genuine controversy with concrete facts." *Id.* Unlike in *Boilermakers*, Gower's complaint presents a genuine controversy with concrete facts.

[120] When asked at oral argument whether Trux would void the Share Sales on the Company's books if the court were to enter judgment in favor of Plaintiff, Trux's counsel equivocated. Dkt. 65 (Hrg. Tr.) at 33:4–7 ("The only thing I can say at this point, Your Honor, is it is an extremely remote possibility that there would ever be a dispute about this if Mr. Gower prevails in this lawsuit.").

[121] *Id.* at 26:17–21 ("Trux is not named as a nominal party here. We are named as an actual party in the declaratory judgment case, claim. And, therefore, we would have to defend the case in some way."); *id.* at 26:12–15 ("It would be unfair to require Trux to engage in this litigation, to engage in discovery, to take positions on matters that we really have no interest in.").

41

that Trux effectively is a nominal defendant, even though not denominated as such in the Complaint. Accordingly, the court does not anticipate that Trux will be a participant in these proceedings to the same extent as the remaining Defendants. In that respect, Trux "has not shown that it would suffer any additional mutual burden or difficulty in remaining a defendant in this action." *Sprint Nextel*, 2008 WL 2737409, at *14.

Trux has staked its motion to dismiss solely on the theory that it has absolutely no interest in this action. For the reasons stated above, I am not persuaded that the Company is an improper party with no interest in the outcome of this action. Trux's motion to dismiss is therefore denied.

## III. CONCLUSION

For these reasons, the motions to dismiss Count I and Count II are denied, and the motions to dismiss Count III are granted for failure to state a claim.

**IT IS SO ORDERED.**